IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| VR ACQUISITIONS LLC,<br><br>       Plaintiff,<br><br>v.<br><br>WASATCH COUNTY, the JORDANELLE SPECIAL SERVICE DISTRICT, the JORDANELLE SPECIAL IMPROVEMENT DISTRICT NO. 2005-2, JAY PRICE and DAN MATTHEWS,<br><br>       Defendants. | FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER<br><br><br>Case No.:  2:15-cv-00018-DAK-EJF<br><br>Judge Dale A. Kimball |

This matter is before the court on Plaintiff VR Acquisitions LLC's ("VR Acquisitions") Motion for a Preliminary Injunction. An evidentiary hearing on the motion was held on January 29, 2015.  At the hearing, Plaintiff VR Acquisitions was represented by Timothy J. McCaffrey and Robert G. Wing.  Defendant Wasatch County was represented by Barton H. Kunz II, and Defendants Jordanelle Special Service District, Jordanelle Special Improvement District No. 2005-2, Jay Price and Dan Matthews were represented by Mark R. Gaylord, Tyler M. Hawkins, and Melanie J. Vartabedian.   The court has carefully considered the memoranda and other materials submitted by the parties, along with the sworn testimony of witnesses presented at the evidentiary hearing.   Since taking the matter under advisement, the court has further considered the law and facts relating to this motion, the testimony of the witnesses presented

at the hearing, and the arguments presented by counsel.  Now being fully advised, the court renders the following Findings of Fact and Conclusions of Law and Order.

## FINDINGS OF FACT[1]

1.	Jordanelle Special Service District ("JSSD") is a limited purpose quasi-governmental entity created by Wasatch County pursuant to Utah law.  Utah Code Ann. § 17D-1-101, *et seq*.

2.	The Wasatch County Council (the "Council") acts as the governing body of JSSD.  Utah Code Ann. § 17D-1-301.

3.	Although the governing body may delegate administrative duties to an administrative board, only the governing body (Council) has the authority to "levy an assessment."

4.	JSSD was established in 1993 to plan for the successful and orderly development of a water and sewer system to provide public water and sewer services to the Jordanelle Basin surrounding the shoreline areas of the Jordanelle Reservoir (the "Reservoir") in Wasatch County, Utah.

5.	Once the Reservoir filled to capacity in approximately 1995, development around the basin accelerated.

---

[1] The court notes that the findings of fact and conclusions of law made by a court in deciding a preliminary injunction motion are not binding at the trial on the merits. *University of Texas v. Camenisch*, 451 U.S. 390 (1981).

2

6.      JSSD undertook the task to construct public sewer and water facilities starting with Phase 1 and Area A located on the Western side of the Reservoir along Hwy 40 adjacent to Deer Valley.

7.      JSSD used the common tool of assessment bonds as a means to finance the construction of public infrastructure, which bonds are known to the financial markets as "dirt bonds" since they are secured solely by assessments levied against participating land owners based on equivalent residential units ("ERUs").

8.      The ERUs were determined through a joint master-planning effort with JSSD and property owners within Phase 1 and Area A.

9.      Sewer and water systems were eventually planned and the main systems were gradually constructed within Phase 1 and Area A with the cooperation and support of property owners.

10.     The installation of public infrastructure continued within Area B, which is located on the Northeast side of the Reservoir.

11.     JSSD's role in the proper development of the lands within its jurisdiction arises out of its governmental role to provide adequate capacity rights regarding sewer and water to accomplish the development needs and desires of its citizens.

12.     The value and desirability of property within these assessment areas will depend, to a great extent, on the construction of infrastructure to serve the future needs of the assessment area.  Each parcel of property will receive a special benefit by ensuring capacity rights, rights of service, and use of a modern, efficient and publicly owned and operated sewer

system. JSSD's purpose was to provide water and sewer services to landowners within the district based on their needs.

13. JSSD engaged Franson-Noble & Associates, Inc. to prepare a pilot study, which was completed in March of 2002 and encaptioned, Water Reclamation Facility Impact Fee Study. Neither JSSD nor its governing body (the Council) had made any decisions regarding the actual construction of a water reclamation facility at that time. This study does not evidence the intent of Defendants as related to the ultimately-constructed water reclamation facility within Area C.

14. After 2002, but before 2005, because of a desire expressed by landowners in the yet-created Area C to develop their land, it was proposed that JSSD would construct and provide improvements to the landowners. One of the landowners in that area (which would become Area C), was Robert Larsen. At the time, Mr. Larsen owned land, designated as Victory Ranch, in what would later become Area C.

15. Thereafter, each property owner within the proposed Area C, including Mr. Larsen, voluntarily and of their own volition determined the number of ERUs they wanted assigned to their properties. The six property owners that were to be a part of Area C certified a total of 3,318 ERUs that they planned to develop within the newly-formed improvement district.

16. The property owners within the proposed Area C met on multiple occasions with representatives of JSSD, including Steve Jackson (engineer), Dan Matthews (general manager), as well as with Jon Bronson of Zions First National Bank, in which they identified the number of

ERU's and the types of infrastructure to be constructed for their benefit.  Some property owners expressed a need for water and sewer infrastructure while others sought only sewer infrastructure.

17.     JSSD, in consultation with its engineers, moved forward with the design of a water reclamation facility that would serve the capacity needs of the property owners within Area C.  The engineers designed a water reclamation facility with a design capacity of approximately 1 million gallons per day based on State of Utah regulatory guidelines which required JSSD to allocate 340 gallons per day per ERU because there was no historical data.

18.     The design of the water reclamation facility was only capable of serving the capacity needs of the 3318 ERUs identified by the property owners within Area C.

19.     Based on the interest expressed by the six property owners, JSSD, by and through its seven member governing body, unanimously voted to notify the public, and in particular the property owners who would be collateralizing their property to finance the design and construction of the improvements required to meet the requested 3,318 ERUs capacity, that JSSD was creating an assessment area (Area C) to construct Improvements for the benefit of the property owners within Area C.

20.     In compliance with Utah law, the 2005 Notice of Intention was mailed to all property owners within the proposed assessment area and published in the *Wasatch Wave*. *See* Utah Code Ann. § 17A-3-206 (recodified).

21.     The 2005 Notice of Intention specifically set forth the nature and scope of the assessment as mandated by, and in compliance with, Utah Code Ann. § 17A-3-205 (recodified).

22.     Based on the current record, it is not clear to the court that the 2005 Notice of Intention was false or misleading, as alleged by Plaintiff.

23.     Based on the current record, it is not clear to the court that, either before or after the 2005 Notice of Intention, Defendants had the intention to either (1) use the improvements constructed pursuant to the 2005 Notice of Intention to benefit properties that would not be levied with special assessments, or (2) engage in any of the bad acts alleged by Plaintiff in its Complaint.

24.     With the support of all the property owners within Area C, in February 2006, the seven member Council unanimously passed a resolution creating the improvement district (the "Creation Resolution").

25.     No objections were voiced by any of the property owners within the proposed Area C assessment area.  Nor did any property owners within the newly created assessment area file an action within thirty (30) days after the adoption of the Creation Resolution.

26.     With the adoption of the Creation Resolution, JSSD was obligated to provide and the property owners had the right to connect up to 3318 residential units to the improvements constructed for their benefit.

27.     By June 2009, more than ninety-percent of the improvements were completed. On June 23, 2009, JSSD caused a Notice of Proposed Assessment to be recorded against all the property owners within Area C.  As required by Utah law, copies of the Notice of Proposed Assessment were mailed to all property owners within Area C, including Mr. Larsen (the prior owner of Victory Ranch), and published in the *Wasatch Wave*.  Utah Code Ann. § 11-42-402.

28.  The Notice of Proposed Assessment notified all property owners affected by the passage of the assessment that a Board of Equalization had been appointed and that it would hold hearings on June 30, July 1, and July 2, 2009 to allow any interested party to voice objections to the proposed assessment.  The Board of Equalization met as required and then made findings and recommendations to the governing body of JSSD.

29.  During the Board of Equalization hearing, two of the six property owners appeared and requested adjustments to the assessment.  A representative of Cummings Land & Livestock, LLC ("Cummings") appeared and requested that the Cummings family homestead be removed from the assessment area so that it would not be pledged as collateral for the assessments to be levied.  JSSD accommodated Cummings and removed the homestead from the assessment.

30.  On July 8, 2009, the County Council, as the governing board of JSSD, unanimously adopted an Assessment Ordinance levying an assessment against all the property owners within Area C, including the Victory Ranch property.

31.  No objections were filed by any of the affected property owners within Area C or any other party, including Mr. Larsen, either before or at the July 8, 2009 public hearing when the Assessment Ordinance was adopted.

32.  The Assessment Ordinance took effect on July 15, 2009.

33.  Neither the prior owner of Victory Ranch (Mr. Larsen), nor any property owners within Area C filed an action, pursuant to Utah Code Ann. § 11-42-106, within thirty (30) days after the effective date of the Assessment Ordinance.

34. JSSD, by and through the Board of Equalization and its governing board, determined that the property owners (identified on the Assessment List) will be directly or indirectly benefited by the improvements in an amount not less than the assessment and that no parcel within Area C will bear more than its proportionate share of the costs of such improvements.

35. Based on the current record, it is not clear to the court that, either before or after the effective date of the 2009 Assessment Ordinance, Defendants had any intention to either (1) use the improvements constructed pursuant to the 2005 Notice of Intention to benefit properties that would not be levied with special assessments, or (2) engage in any transactions to personally benefit themselves and/or their family members or cronies as alleged by Plaintiff in its Complaint.

36. On or about November 1, 2009, JSSD sent notice to all property owners of record in the assessment area of their right to elect to either pay the assessment in its entirety or pay the assessment over twenty years.  The Prior Owner of Victory Ranch (Mr. Larsen) unilaterally elected to pay the assessment over twenty years.

37. On February 1, 2010, Mr. Larsen made the first assessment payment ($2,088,990.07).  On November 10, 2010, however, a Wells Fargo Bank (lender) special purpose entity, ATC Realty Sixteen, Inc. ("ATC Realty"), obtained title to Victory Ranch via a deed in lieu of foreclosure from Mr. Larsen.  ATC Realty held title to the Victory Ranch property for over two years, during which time it made the required annual assessment payments on February 1, 2011 and February 1, 2012 without objection.

38. Plaintiff was formed as an entity in February 2012. On May 2, 2012, Plaintiff purchased the Victory Ranch property.

39. Plaintiff purchased the Victory Ranch property subject to the Assessment Ordinance and assessment lien that had been levied against the Victory Ranch property in 2009.

40. At the time Plaintiff purchased Victory Ranch, the assessment liens created by the establishment of the improvement district in 2005 and adoption of the Assessment Ordinance in 2009 were a matter of public record.

41. Plaintiff conducted due diligence prior to purchasing the Victory Ranch property for $17 million.

42. Plaintiff paid the February 2013 annual assessment ($2,042,219.16). A year later, on January 31, 2014, Plaintiff made a second assessment payment in the amount of $2,027,939.18. Plaintiff did not file the instant action until just three weeks before its February 1, 2015 assessment payment was due.

43. Based on the current record, it is not clear to the court that Defendants attempted to conceal any of their actions related to the 2005 Notice of Intention, the Creation Resolution, or the Assessment Ordinance, as alleged by Plaintiff in its Complaint.

44. The documents related to JSSD, including those related the creation of the assessment area and the adoption of the Assessment Area, are a matter of public record.

45. Based on the current record, it is not clear to the court that any of the Defendants, or their agents or representatives (including Jay Price and Dan Matthews)

personally benefitted from creation of the assessment area or adoption of the Assessment Ordinance, as alleged by Plaintiff in its Complaint.  Further, it is not clear to the court based on the current record that any of Defendants' family members, associates, or friends personally benefitted from any assessment funds, as alleged by Plaintiff in its Complaint.

46.     Based on the current record, it is not clear to the court that JSSD's purchase of the Best Ranch in June of 2006 was anything other than an arms-length transaction approved by the Administrative Control Board of the JSSD on May 2, 2006 and pursuant to a properly adopted resolution.

47.     Based on the current record, it is not clear to the court that either JSSD or its general manager, Mr. Matthews, acted improperly in negotiating and/or consummating the purchase of the Best Ranch from Fishin' With Bread, LLC ("Fishin' With Bread"), as alleged by Plaintiff in its Complaint.

48.     Based on the current record, it is not clear to the court that either JSSD or its general manager, Mr. Matthews, used Tom Flinders and/or Fishin' With Bread as a strawman to purchase the Best Ranch, as alleged by Plaintiff in its Complaint.

49.     Based on the current record, it is not clear to the court that either Dan Matthews or anyone else associated with JSSD received any kickbacks or personal benefits as a result of the transaction with Fishin' With Bread, as alleged by Plaintiff in its Complaint.

50.     Based on the current record, it is not clear to the court that either Dan Matthews or anyone else associated with JSSD had knowledge of the purchase price paid by Fishin' With

Bread to the original sellers of the Best Ranch until after the transaction was closed, which knowledge came several years after the closing.

51. Based on the current record, it is not clear to the court that the Water and Wastewater Development and Service Agreement by and between Twin Creeks Special Service District ("TCSSD") and Red Ledges Land Development, Inc., ("Red Ledges") dated October 18, 2012, was anything other than an arms-length transaction.

52. Based on the current record, it is not clear to the court that JSSD's willingness to provide water and sewer service to TCSSD and Red Ledges was not reasonable and sound public policy.

## CONCLUSIONS OF LAW

1. Under Utah law, JSSD (and like entities) can assess property owners only an amount that is "fair and equitable according to the benefit of the benefitted property from the improvement." Utah Code Ann. § 11-42-409(5)(a).

2. The amount of the assessments for improvements in a special improvement district shall not exceed the sum of certain costs and expenses laid out by Utah law. Utah Code Ann. § 17A-3-213.

3. A property owner who is assessed an assessment does not acquire ownership in the public infrastructure constructed by the special service district. Rather, a developer of property acquires only the capacity right to connect to the public improvements constructed by the special improvement district based on the number of ERUs contemplated by a particular

development.  In other words, they bargain for and are assessed based on the capacity (*i.e.*, the number of ERUs that will be connected to the public improvements).

4.      This Court has personal jurisdiction over each of the defendants in this matter. Wasatch County, the Jordanelle Special Service District and the Jordanelle Special Improvement District No. 2005-2 are political subdivisions of the State of Utah. Jay Price and Dan Matthews are Utah residents.  Moreover, each of the defendants were properly served.

5.      This Court has subject matter jurisdiction over each of the claims alleged in Plaintiff's Complaint.  Subject matter jurisdiction is proper in this Court under 28 U.S. C. §1331. Claims brought under 42 U.S.C. §1983 present federal questions.

6.      Plaintiff Victory Ranch has standing under Article III of the United States Constitution. Purchasers of land have standing to challenge unreasonable limitations on its use and value. *Palazzolo v. Rhode Island*, 533 U.S. 606, 627 (2001).  As the current owner of the assessed land Plaintiff asserts its own rights, not the rights of the prior owner. *Commonwealth Prop. Advocates v. Mortgage Elec. Registration Sys.*, 680 F.3d 1194, 1201 (10th Cir. 2011) (unpublished) ("Plaintiff's decision to purchase the encumbered property in no way deprived it of the right to challenge an allegedly unauthorized foreclosure" and "[b]ecause Plaintiff is the current owner of the real property, a foreclosure would injure Plaintiff directly.  Therefore, Plaintiff also has prudential standing, and we may proceed to the merits.")  Plaintiff alleges the assessment against the property is unconstitutional.  When considering whether a plaintiff has standing, a court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."  *Warth v. Seldin*, 422 U.S. 490, 501

(1975). If Plaintiff's allegations are true, Defendants have violated Plaintiff's constitutional rights, and the claims belong to Plaintiff.  In addition, if the allegations of the Complaint are true, Plaintiff has suffered injury in fact.  Plaintiff alleges it is injured because it must either pay an unconstitutional annual assessment or subject its property to foreclosure.  According to the allegations of the Complaint, this injury is traceable directly to Defendants' actions.  Defendants argue that there is a lack of causation because Plaintiff did not exist at the time many of the actions complained of occurred. But under *Palazzolo,* purchasers of land have standing to challenge governmental actions that unreasonably limit the value of their property.

      7.      This suit is not barred by principles of comity.  Principles of comity counsel federal courts to resist engagement in state tax matters. *Levin v. Commerce Energy, Inc.* 560 U.S. 413, 421 (2010).  Because the assessments in this case are not taxes, however, the doctrine of comity does not bar Plaintiff's claims.

      8.      The tax injunction act does not deprive this Court of jurisdiction.  The tax injunction act applies only to the collection of taxes, not fees or other assessments.

### *Preliminary Injunction*

The right to injunctive relief is an extraordinary remedy.  A plaintiff is eligible for a preliminary injunction only if it establishes the following four factors: (1) a substantial likelihood of success on the merits of the case; (2) irreparable injury to the movant if the preliminary injunction is denied; (3) the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction; and (4) the injunction is not adverse to the public

interest. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009); *Salt Lake Tribune Publishing Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1099 (10th Cir. 2003).

9. The right to relief in a preliminary injunction must be "clear and unequivocal because a preliminary injunction is an extraordinary remedy." *AT&T Corp.*, 320 F.3d at 1081.

10. If a preliminary injunction alters the status quo, then a plaintiff "bears a heightened burden and must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *GM Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007). The party seeking the preliminary injunction must show that the preliminary injunction factors "weigh *heavily and compellingly* in its favor." *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1097 (10th Cir. 1991). "The status quo is defined by the reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights." *Utah Gospel Mission v. Salt Lake City Corp.*, 316 F.Supp.2d 1201, 1220 (D. Utah 2004) (quoting *Visa*, 936 F.2d at 100).

11. Here, Plaintiff's request for preliminary injunctive relief is subject to the heightened burden because Plaintiff is seeking to alter the status quo. The status quo is Plaintiff continuing to make its assessment payments. Plaintiff is not currently in default of its assessment obligations. Plaintiff has failed to overcome its heightened burden on any of the elements of a preliminary injunction. On this basis alone, Plaintiff's request for preliminary injunction is denied.

12. Even if Plaintiff were not subject to a heightened burden, it has not satisfied the standard burden for a preliminary injunction.  Moreover, even if Plaintiff were subject a more relaxed burden, Plaintiff has not satisfied such a burden.

13. Plaintiff has not shown that there is a substantial likelihood that it will succeed on the merits.

14. Plaintiff will not be irreparably harmed if this Court does not enjoin the Defendants.

    a. "Irreparable harm, as the name suggests, is harm that cannot be undone, such as by an award of compensatory damages or otherwise." *Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1005–06 (10th Cir. 2003).  "Mere threatened, speculative harm, without more, does not amount to irreparable injury for purposes of justifying preliminary injunctive relief." *Chemical Weapons v. U.S. Dept. of Army*, 935 F.Supp. 1206, 1215 (D. Utah 1996).  A plaintiff must show that irreparable injury is "certain, great, actual; not theoretical." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005).  Plaintiff will not suffer irreparable harm here.  Even assuming that Plaintiff elects not to make the assessment payment, JSSD cannot, as explained in Defendants' memorandum, foreclose on the property for at least 150 days after Plaintiff's default.

15. Plaintiff has not demonstrated that the balance of harm weighs in its favor. Based on the current record, JSSD will be significantly harmed if it is now enjoined.

16. Plaintiff has not demonstrated that issuing an injunction here would be in the public interest. Plaintiff must show, "clearly and unequivocally, that it would not be adverse to the public's interest to grant the injunction." *Utah Gospel*, 316 F.Supp.2d at 1223.

17. Plaintiff has failed to meet any of the four preliminary injunction requirements and, accordingly, the Court concludes Plaintiff is not entitled to a preliminary injunction.

ORDER

Based on the foregoing findings and conclusions, Plaintiff's motion for a preliminary injunction [Docket No. 3] is DENIED.

DATED this 30th day of January, 2015.

BY THE COURT:

_____
Honorable Dale A. Kimball
United States District Court Judge